UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Monarch Nut Company, LLC et al.,

                         Plaintiffs,

       v.

Goodnature Products, Inc. et al.,

                         Defendants.

**Report and Recommendation**

14-CV-1017S

## I.    INTRODUCTION

Around 2009, plaintiffs Monarch Nut Company, LLC and Munger Farms ("Monarch" collectively), and their owner, Kable Munger,[1] decided that they wanted to expand their business beyond the growing and selling of fresh blueberries. Monarch wanted to develop a business of making sweetened dried blueberries but had no prior experience with that kind of product. Monarch's desire to enter the dried fruit market eventually led to conversations with defendants Goodnature Products, Inc., Goodnature National, Inc., and Goodnature Inex, LLC ("Goodnature" collectively); Goodnature's purported[2] CEO, Dale Wettlaufer ("Wettlaufer"); and CPM Wolverine Proctor ("CPM"). By early 2011, Monarch completed agreements with Goodnature, Wettlaufer, and

---

[1] The record contains references to both a Kable Munger and a Kewel Munger. (*See, e.g.*, Dkt. No. 94-5 at 23, 25.) The Court cannot discern whether the references might be misspelled references to the same person, nicknames for the same person, or distinct references to different people. The Court will proceed referring to Kable Munger as the owner. This issue has no bearing on the substance of the case, and the Court notes it here only for the sake of the record.

[2] The Court has to use the word "purported" because Monarch has challenged who Wettlaufer is. (*See* Dkt. No. 94-1 at 2 ("Dale E. Wetlaufer ('Mr. Wetlaufer') is an individual and the Founder, former Chief Executive Officer, and a shareholder of Goodnature. RESPONSE: The Plaintiffs admit that Dale E. Wetlaufer is an individual, but deny the remainder of the paragraph and deny that the cited documentation supports that fact. As recently as April 3, 2018, Dale E. Wetlaufer held himself out as the Chief Executive Officer of Goodnature Products, Inc. and Goodnature National, Inc.").)

CPM to purchase infusion and drying equipment that would allow it to prepare sweetened dried blueberries.

Unfortunately, something went wrong during the process of installing the equipment at Monarch's facility and gearing it up for regular production. In short, Monarch never reached production levels that it hoped to achieve, stopped production altogether by 2015, and terminated certain patent licensing rights by June 2016. The parties of course disagree as to what exactly went wrong—bad equipment puffed up by fraudulent statements about production capacity, in Monarch's view; or bad decisions about plant construction and operation, in defendants' view. Monarch commenced litigation accusing defendants of various wrongdoing including negligence, fraud, and breaches of express and implied warranties.

The parties now come before the Court on five different motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The Court will address details below, but a lot of the issues in the motions revolve around provisions in certain contracts that limited both warranties and remedies in the event that problems arose. District Judge William M. Skretny has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 84.) The Court held oral argument on June 27, 2018. The Court now respectfully makes recommendations on the five pending motions as explained below.

## II. BACKGROUND

### A. The parties meet and form contracts.

This case concerns allegations of inflated promises for the performance of equipment that infuses and dries blueberries. As a very basic background, infusion is a process for enhancing the sugar content of dried fruit. At least some dried fruit available in grocery stores is sweetened before dried and packaged for selling. There might be other ways to sweeten the fruit, but one method

known in the industry consists of exposing fruit to a flavored syrup that has a desired sugar content, measured in a unit called Brix. One degree Brix is one gram of sucrose in 100 grams of aqueous solution. As the fruit spends time in the infusing syrup, water in the fruit is replaced with syrup, and the Brix value of the infused fruit gradually approaches that of the syrup. The sweetened fruit then goes through a drying process. Monarch, a California corporation, grows, infuses, and dries blueberries and nuts.[3] Goodnature and Wettlaufer, from Orchard Park, New York, design and sell berry infusion equipment. CPM, from Pennsylvania, designs and sells berry drying equipment. Goodnature and Wettlaufer own several patents pertaining to fruit infusion (the "Patented Technology," collectively). In one of the patents, U.S. Patent No. 6,159,527, the abstract contains an overview of the entire infusion process that supplements the Court's summary:

> Method and apparatus for infusing fruits (which may include vegetables) with sugar. The apparatus includes a series of interconnected tanks (10, 12, 14 and 16). A stratified column of infusing liquor is caused to flow from a tank (50) via variable output pump (52) through fruit which is placed within the tanks to cause the fruit to become saturated with sugar. In addition, the fruit is placed in a plumping liquid in the tanks prior to infusing and the infusing liquor will drive the plumping liquid in front of it. The fruit may be conditioned in various ways prior to placement in the tanks, which conditioning may remove fruit juice from the fruit, the fruit juice being collected in a tank (36) for subsequent use. Alternatively, if fruit juice is not removed from the fruit during a conditioning process, fruit juice is extracted from the downstream portion of the plumping liquid.

U.S. Patent No. 6,159,527 (filed Jan. 15, 1999).

The relations between the parties began in 2009. Monarch was interested in entering the dried fruit market for blueberries, though the parties cannot agree why. Goodnature and Wettlaufer assert that Monarch's interest came from supply fluctuations. "In 2008 and 2009, there was a glut of blueberries on the market, which caused a reduction in sale price of fresh blueberries. In an effort

---

[3] Monarch appears to have denied growing nuts. (Dkt. No. 111-12 at 3; Dkt. No. 114 at 3.) (*But see* Dkt. No. 111-4.)

to maximize profits, Plaintiffs froze a lot of their blueberries and began looking for ways to process

the frozen blueberries instead of selling them as fresh." (Dkt. No. 79-33 at 2.) Monarch denies any

glut of blueberries in 2008 or 2009:

> The Plaintiffs deny that there was a glut of blueberries in 2008 or 2009; deny
> that there was a reduction in the sale price of fresh blueberries in 2008 and 2009;
> deny that they froze a lot of blueberries in an attempt to maximize profits for selling
> frozen blueberries instead of selling them fresh. Additionally, the Plaintiffs dispute
> the cited documents supports that fact. In fact, the cited documentation quotes the
> deposition of Cynthia Klein as "When I started, they (Plaintiffs) were very profitable
> without going to process-type operations." Klein's deposition testimony continues
> that Plaintiffs grew 35 million pounds of blueberries for the 2008 season and only
> froze one million pounds that were to be sold on the frozen market. (Hoppe Decl.
> at ¶ 2, Exhibit B.) According to the United States Department of Agricultural
> Economic Research Service, the value of utilized blueberry production in California
> increased from $48,580,000 in 2008 to $71,148,000 in 2009 clearly indicating no
> "glut" in the blueberry market. In 2008 and 2009, California sold all of the fresh
> blueberries produced those years. (Hoppe Decl. at ¶ 3, Ex. C.) In 2008 and 2009,
> demand exceeded productions for Plaintiffs' fresh blueberry crops. Prior to 2008
> and as part of their normal business practice, Plaintiffs routinely and regularly sell
> frozen blueberries on the market to commercial and retail customers. (Munger Decl.
> at ¶ 1.)

(Dkt. No. 94-1 at 3.) Either way, Monarch reached out in 2009 to some sales representatives at a

trade show, who in turn encouraged Goodnature to reach out to Monarch to explore what Monarch

had in mind. (*Id.* at 4.) Monarch never had infused berries before. Monarch had conversations

with Goodnature about its Patented Technology and what companies could supply infusion and

drying equipment. (Dkt. No. 86-13 at 3.)

On September 17, 2009, Goodnature submitted to Monarch a detailed project quotation

from sales representative Christopher Kelley titled, "Infusion of Blueberries via Goodnature's

Patented Infusion Process, Quotation 1940 rev. 3" ("Quotation 1940"). (Dkt. No. 94-3 at 71.)

Goodnature prepared the quotation for an infuser system that included six infusion vessels. (*Id.* at

72.) The core quotation described a system of approximately 55 different components with an

estimated cost of a little over $3.8 million. (*Id.* at 74.) The components were assigned line items;

4

line item 51 was an engineering package that would assist with installation of the infusion system. (*Id.*) The quotation included an optional component, a buffer tank, for an additional $102,000; the buffer tank would increase Monarch's annual planned feed capacity from 6.42 million pounds of raw fruit to 6.96 million pounds. (*Id.* at 75.) The quotation did not include certain accessories and infrastructure costs, such as syrup tanks and a "building with associated lighting, air conditioning and general services." (*Id.* at 76.)

Quotation 1940 contained three addenda and a list of terms and conditions of sale. Addendum 1 assumed purchase of the optional buffer tank and made the following estimates of production capability (reprinted here verbatim):

Assumptions

- Infusion Process runs continuously 350 days per year no stops for weekends and assume availability of labor after typical business hours

Production Capabilities

- 350 day operation provides a total of 8400 hours of infusion time

- Infusion process takes approximately 68 hours plus two hours for loading and two hours for unloading. Complete infusion batch process is then 72 hours.

- Number of infusion "batches" (10,000 pounds each) [handwritten note added, "maybe 9,500"] would therefore be 116 (8400/72) per year for one infuser

- Six infusers would allow a total of 696 batches per annum

Annual Production Rates

- Plant would be capable of handling an incoming feed of 6,960,000 (696 x 10,000) pounds of free-flowing frozen cultivated blueberries.

- Based on the yield number of 40 to 45% we would estimate that the six infuser facility would be capable of producing between 2,784,000 to 3,132,000 pounds of sweetened dried cultivated blueberries annually.

- The process would also provide 321,000 gallons of single strength blueberry juice or 49,400 gallons of concentrate.

(*Id.* at 80.) Addendum 2 provided more detail for the engineering package described as line item 51 in Quotation 1940. (*Id.* at 81.) Among other details, the engineering package would include a process and instrumentation diagram for the infusion process; a complete process schedule; and the complete design and engineering of all equipment included in the package. (*Id.*) Addendum 3 provided additional information about a company that, as of that writing, was the only other company that had permission to use the Patented Technology. (*Id.* at 82.) Finally, Quotation 1940 ended with a section titled, "General Terms and Conditions of Sale and Warranty." (*Id.* at 83.) According to the provision about an effective date, this page would take effect and would become the purchase contract between the parties "effective as of the date of such acceptance by Seller." (*Id.*) Among other provisions, the terms contained a paragraph, titled "Installation and Training," the first half of which read as follows:

> Unless otherwise specifically provided herein, the Buyer shall have full responsibility for the installation and the initial starting up of the equipment, and Seller shall not be responsible for any damages to the equipment or to other property, or any personal injury, or any consequential damages, arising out of or in connection there with, and Buyer shall indemnify and hold Seller harmless with respect to all such damages or claims arising out of or in connection with such installation. Any materials not specifically listed in this Agreement shall be furnished by Buyer and Seller makes no representations or warranties with respect thereto. For certain equipment, the Seller recommends installation and start up to be performed under the supervision of Seller's representative. Installation and training by Goodnature Products can be provided at additional cost and is strongly recommended for successful installation. Training is provided at no extra charge at our Buffalo, N.Y. test facility.

(*Id.*) The terms contained a one-year warranty against defective system components from the date of delivery, assuming that Monarch provided written notice and an opportunity to inspect any defects. (*Id.* at 83.) The particular component of press bags had a 30-day warranty against defects in materials or workmanship. (*Id.*) The Court mentions these warranties because of the paragraph that follows them:

DISCLAIMER OF WARRANTIES. THE FOREGOING WARRANTY EXPRESSIONS ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND EXISTENCE OF ANY SUCH OTHER WARRANTY IS HEREBY DENIED.

(*Id.*) The next paragraph in the terms limited Monarch's remedies in the event of a breach:

The liability of Seller for breach of any warranty obligation hereunder is limited to: (I) the repair or replacement of the equipment on which the liability is based; or (II) at Seller's option, the refund to Buyer of the amount paid by Buyer to Seller for said equipment. All other liability of Seller with respect to this Agreement, or from the manufacture, installation, maintenance, repair or use of any equipment covered by or furnished under this Agreement, whether in contract or in tort, or otherwise, is limited to the amount paid by Buyer to Seller pursuant to terms hereon. SELLER SHALL NOT BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER. THE REMEDIES SET FORTH HEREIN ARE EXCLUSIVE.

(*Id.*) Under the provisions, Monarch could cancel the order only upon written notice and payment of reasonable compensation. (*Id.* at 84.) The parties would agree that the purchase contract/warranty would be interpreted under New York law, including the New York Uniform Commercial Code. (*Id.*) The parties would agree also to Buffalo, New York as the venue for any disputes. (*Id.*) The final paragraph consisted of an integration provision:

This Agreement and the Seller's price lists as revised from time to time shall constitute the entire Agreement between Buyer and Seller irrespective of inconsistent or additional terms and conditions in Buyer's purchase orders or other documents submitted to Seller whether or not same have been executed or otherwise accepted by Seller. Except as specifically set forth herein, all other agreements, proposals, and understandings with respect to the subject matter of this Agreement are merged herein, and there are no promises, terms, conditions, or obligations with respect thereto other than those continued here in and in Seller's currently published price lists as revised from time to time by Seller. Any and all representations, promises, warranties or statements by Seller's agents that differ in any way from the terms and conditions of this Agreement shall be of no force or effect. This Agreement may be amended only by a written instrument executed by all parties.

(*Id.*)

On October 24, 2009, Goodnature, Wettlaufer, and Monarch entered a contract called the Licensing and Royalty Agreement (the "Licensing Agreement"). (Dkt. No. 94-3 at 90.) Among other provisions of the Licensing Agreement, Monarch acquired the exclusive right to use the Patented Technology and agreed that it "will use its best efforts to manufacture and use the Patented Technology in all the civilized countries of the World, and will exert its best efforts to create a demand for the products of said Patented Technology." (*Id.*) The Licensing Agreement created a payment system with a series of conditions, but the core condition appears to have given Monarch the choice of either paying an annual royalty fee of $100,000 or of ordering at least six infusion machine systems, or infusers, "as spelled out in Goodnature National Quotation #1940 Revision 3, dated September 17, 2009." (*Id.* at 91.) This mention of Quotation 1940 is important: Quotation 1940 itself was unsigned, but through this provision, it was incorporated into the Licensing Agreement. Paragraph 12 of the Licensing Agreement addressed equipment performance; because of its potential importance to the pending motions, the Court reprints Paragraph 12 here in its entirety:

> LICENSOR [*i.e.*, Goodnature and Wettlaufer] makes no yield guarantees except to say that, based upon limited previous laboratory testing of fruit supplied by the LICENSEE [*i.e.*, Monarch] for testing purposes, it is reasonable to expect a yield (weight of oiled, dried product divided by weight of frozen raw fruit) of 45 percent or more to be achievable using the patented methods and equipment, assuming the fruit supplied to this equipment is similar or identical to the fruit supplied for testing purposes. Yield is expected to fluctuate from year to year depending upon varieties of fruit used, harvesting techniques, and method and the length of storage of such fruit. Use of the patented equipment and process is not recommended for "Rabbit Eye" and similar thick-skinned varieties, which usually produce much reduced yields.

(*Id.* at 92–93.) Paragraph 14 addressed amendments:

> This Agreement supersedes all prior agreements, understandings, representations, and statements, if any, regarding the subject matter contained herein, whether oral or written, and no amendment of this Agreement shall be valid and binding upon the parties unless made in writing and signed by each of such parties.

(*Id.* at 93.)  With the final signature coming on October 24, 2009 (*id.*), the Licensing Agreement—

with Quotation 1940 incorporated—took effect and constituted the final contract between

Monarch, Goodnature, and Wettlaufer.

On March 19, 2010, Goodnature sales representative Christopher Kelley[4] provided Monarch

with a document titled, "Monarch Nut Infused Blueberry Sell Sheet" (the "Sell Sheet").  In the Sell

Sheet, Kelley made a number of representations that potentially affect the pending motions.  Kelley

stated generally that Goodnature's infusion process would create blueberries that "are superior to

other sweetened dried blueberries with regards to flavor, mouth feel, natural color retention,

nutritional value and size." (Dkt. No. 76-3 at 56.)  Kelley also asserted generally that, "when given a

side-by-side choice," "the consumer will always choose the fruit produced by Monarch Nuts."  (*Id.*)

Kelley then made more specific representations under seven different headings, four of which

appear to have particular relevance to Monarch's arguments.  Those four sections of the Sell Sheet

are reprinted here in their entirety:

Flavor:

The patented infusion process used by Monarch is a relatively low temperature
system which minimizes the addition of heat to the blueberries.  Minimizing heat in
the process allows the blueberries to retain their natural flavors as flavor essence is
not cooked off of the fruit as in other processes.

The patented infusion process is basically a closed loop system which retains all of
the natural juices, sugars and flavor essence from the fruit and keeps it in the fruit.
Other infusion processes strip the fruit of portions of these elements and discharge
them into a waste stream.

Mouth Feel:

The sugars added to the blueberries in the Monarch infusion system are natural
granular sugars (no high fructose corn syrup is used).  The process ensures that these

---

[4] The record contains no affirmations from Kelley, and there appears to be a specific reason why.  "The
Court should be aware that on the representation of counsel for Defendants that Christopher Kelley is
incompetent, the parties have stipulated that he will not testify in this matter . . . ."  (Dkt. No. 105 at 2.)

sugars remain in a gelatin state within the blueberry and that no crystallization of sugars will occur in the final product.  Blueberries produced by other infusion process[es] will tend to exhibit crystallization of sugars in the product after time.  This crystallization results in an unnatural crunching feel when the consumer chews the inferior product.

Natural Color Retention:

Due again to the minimum use of heat in the Monarch Nut infusion process natural colors are retained in the final product.  The addition of excessive heat releases natural colors from the fruit much like excessive heat removes colors from your clothes in the washing process.  With the Monarch process fruit will retain the natural vibrant blueberry blue that customers associate with fresh blueberries in the produce section.

Nutritional Value:

Nutritional values will be verified with your ongoing product testing.  History has shown that the combination of low heat and the closed loop system will retain more of the natural nutrients in the final product.  We can also expect that polyphenol levels in the fruit will be higher as well.

(*Id.*)  The Sell Sheet was never signed.  Monarch owner Kable Munger has affirmed that he relied on Kelley's representations while negotiating a possible purchase from Goodnature and Wettlaufer.  (*Id.* at 68.)

During negotiations between Monarch, Goodnature, and Wettlaufer for infusion equipment, CPM entered the picture.  CPM did so because Goodnature acted as its sales agent for drying equipment, since Goodnature itself did not manufacture drying equipment.  (Dkt. No. 86-9 at 3.)  On April 5, 2010, CPM gave Monarch a detailed quotation for a two-stage dryer system that could dry up to 1,000 pounds of fruit per hour.  (Dkt. No. 86-19.)  CPM's proposal bore Proposal Number EL10515.  In a Letter of Understanding dated April 5, 2010, Monarch requested modifications to the proposal that would give it an 18-month option to purchase other components that would increase capacity to 2,600 pounds per hour.  (Dkt. No. 87-2.)  As modified, the proposed system carried a cost of about $1.2 million.  (*Id.*)  The quotation on its face does not contain any

specifications about the diameter of the blueberries that would be fed into the system. Monarch owner Kable Munger remembers reviewing the quotation. (Dkt. No. 86-9 at 4.) Munger also was the person who wanted a higher drying capacity. (*Id.* at 19.) Munger would have received the results of four test samples that CPM ran in May 2010. (Dkt. No. 86-16 at 13.) The specifications in the quotation would have been set based on the warm infusion test results that Monarch chose from among the four test samples. (*Id.* at 17; *but see* Dkt. No. 96-3 at 81 (CPM did not know what test results Monarch received); Dkt. No. 96-1 at 10 ("Had this data been produced by CPM and Goodnature when it was discovered in May/June 2010, Monarch would have been aware that the cold infused product was not viable with the Proctor drier recommended by Goodnature.").) The parties signed the Letter of Understanding on May 12, 2010. Monarch owner Kable Munger understood that the primary purpose of the facility would be cold infusion but that the equipment had the ability to run warm infusion as needed. (Dkt. No. 86-9 at 16.)

Following continued discussions about the drying specifications that Monarch needed, CPM revised its Proposal Number EL10515. The new 24-page proposal, EL10515 Revision 6 ("Revision 6"), was dated November 30, 2010 and changed a few details for a base drying system—aside from any option to expand—that would have a capacity of 1,100 pounds per hour. (Dkt. No. 87-6.) On December 21, 2010 and January 4, 2011, the parties endorsed Revision 6. (*Id.* at 18.) Revision 6 thus constituted the final, formal contract between Monarch and CPM. Among other provisions, Revision 6 contained a Section G titled "Terms and Conditions." (*Id.* at 22.) CPM included an express warranty against defects in materials and workmanship for 12 months. (*Id.*) CPM explicitly excluded any warranties of merchantability or of fitness for a particular purpose, or any warranties arising from a course of dealing or usage of trade:

EXCLUSION OF WARRANTIES. WARRANTIES OF
MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE OR

ARISING FROM A COURSE OF DEALING OR USAGE OF TRADE ARE
SPECIFICALLY EXCLUDED, AND THERE ARE NO WARRANTIES
EXPRESSED OR IMPLIED WHICH EXTEND BEYOND THE
DESCRIPTION OF THE EQUIPMENT CONTAINED IN THIS
AGREEMENT UNLESS THE WORD "GUARANTEE" OR "WARRANTY" IS
USED IN CONNECTION THEREWITH.

(*Id.*) Damages from lost profits were explicitly excluded. (*Id.* at 23.) The Terms and Conditions

included the following paragraph outlining Monarch's exclusive remedy:

> In the event the equipment does not conform to the provisions of this
> Agreement, the Purchaser's exclusive remedy shall be to give the Company written
> notice of nonconformity within 90 days after erection and start-up, but in no event
> later than 180 days after delivery, whichever date is earlier. Within 90 days after the
> Company shall receive such notice, the Company shall have the option of making
> the Equipment conform to the provisions of this Agreement. If the Company is
> unable to do so, the Company shall, upon written direction from the Purchaser,
> remove the Equipment as soon as practicable, refund any portion of the purchase
> price theretofore paid and cancel the Purchaser's obligation to pay the unpaid
> portion of the price in full satisfaction of the Company's liability hereunder. The
> Company's liability shall not extend beyond refunding the purchase price to the
> Purchaser and accepting the return of the Equipment. The Purchaser shall furnish at
> the Purchaser's expense a means of ingress and egress for removal of the
> Equipment.

(*Id.*) Revision 6 also contained a merger clause that addressed any prior representations and reliance

on them:

> This Agreement duly accepted and countersigned constitutes the complete
> agreement between the parties hereto, there being no prior representations or
> agreements relating hereto. No modification of this Agreement shall be binding on
> the Company unless such modification shall be in writing, accepted by the Purchaser
> [Monarch] and approved by an officer of the Company [CPM]. The Purchaser
> agrees that any affirmations of fact, description of the Equipment or sample or
> model, whether or not the same relate to production, capacity or capability of the
> Equipment to perform, are not the basis of this Agreement.

(*Id.* at 23–24.) Finally, the Terms and Conditions included a provision selecting Pennsylvania law

and Pennsylvania federal or state courts as a venue for any disputes. (*Id.* at 24.)

### B.  Monarch sees problems arise with the equipment.

As the infusion and drying facility came together and went online, Monarch exchanged

numerous communications with Goodnature and Wettlaufer about operational troubleshooting.

Monarch was new to berry infusion, and Goodnature and Wettlaufer wanted to follow through on

the engineering package described in Quotation 1940:

> Q. Did Goodnature provide you [Bill Shipp of IES, an engineering firm hired by
> Monarch] any kind of narrative, "Okay.  This is, you know, the idiot's guide
> to blueberry infusion"?
>
> A. As a single written document?
>
> Q. Right.
>
> A. I got lots of pieces and individual sections of it.  I don't know that I recall an all-
> inclusive start to finish, "Here's what we do."  But I got several pieces and
> sections that—that would get us there.  If there was a specific document or a
> complete one, I am not immediately recalling it.
>
> Q. And when you say pieces and sections, can you give me any description as to
> what those things would be?
>
> A. Yeah.  Lots of e-mails—I can pull some up or show them to you where it's,
> "How does this section work," or "Explain cold infusion to us," "Explain
> warm infusion."  I have replies from Rick [Meredith of Monarch] saying
> we're going to run at this temperature, we're going to go this long, we need
> to hold this rate.  And all those parameters would come back, and we would
> question it and Rick would give us answers or Dale would give us answers.
> So those e-mails became sections.
>
> We asked how do we clean the infuser and we got a couple steps, or how do
> we hook up the infuser, and we'd get a sheet that says turn it this way and
> connect the hoses, turn it that way and connect the hoses.  So we got
> different pieces of information throughout the project.

(Dkt. No. 94-3 at 115.)  In one email message dated February 1, 2011, Wettlaufer advised Monarch

on a number of issues that Monarch raised including tank temperature and juice pumping.  (Dkt.

No. 94-5 at 29–30.)  Even though Quotation 1940 was based on a system with six infusers,

Wettlaufer now advised, "This much I know.  Messing around with juice concentrate when there are

only 6 infusers in the plant is a marginally profitable undertaking. If there were no losses in piping, filtration, etc., the best you could hope for would be to achieve 2 drums of 65 Brix blueberry concentrate a day, along with some filtration and evaporation cost." (*Id.* at 29.) Wettlaufer then offered, "My advice . . . would be to shelve the idea of evaporating the thaw juice until the plant expands to 18 infusers." (*Id.*) Monarch interpreted the advice as an abandonment of a promise in Quotation 1940, though in fairness to Wettlaufer, the advice might have been a short-term improvisation intended to simplify Monarch's situation until more fundamental problems could be corrected. On August 13, 2013, Monarch owner Kable Munger sent Wettlaufer a lengthy letter outlining numerous ongoing problems and concluding that "Goodnature needs to apply its engineering expertise to resolve the design issues that have been left unresolved. Monarch has tried to resolve these issues informally with Goodnature, to no success." (Dkt. No. 94-5 at 12.) The problems that Monarch perceived included excessive time for the infusion process; inability to attain promised yields; ineffective disinfection of the infusers; a buffer tank design that does not allow for measurements directly out of the tank; and insufficient capacity of the dryer. (*Id.* at 9–11.) An exchange of correspondence followed. On September 26, 2013, Wettlaufer wrote to Monarch outlining a plan to visit the Monarch facility. Among other issues, Wettlaufer summarized in one list all of the operational problems that Monarch perceived at that time:

> 1. Total process takes 84 hours instead of 72
>
> 2. Process parameters are too vague
>
> 3. There is a variation in brix from bottom to top
>
> 4. Monarch has not been able to obtain yields that were "represented"
>
> 5. There is a problem of traceability for recall purposes on the syrup
>
> 6. You are unable to do a successful water thaw and you want to do that

7. You are unhappy with the CIP process on the infusers

8. The buffer tank is not feeding fast enough

9. You don't like the buffer tank lids, they are too heavy

10. You don't like the fact that you are the first application to use a large buffer tank

11. The Proctor [CPM] dryer that you purchased directly from Proctor does not seem to have adequate capacity to even handle 6 infusers, let alone 18

12. The dryer give[s] inconsistent results requiring you to "lug off" the fruit and re-oil them

13. You don't like the way the dryer oscillating feeder is working and believe it is caused by the buffer tank feeder.

(Dkt. No. 94-5 at 45.) Wettlaufer also asked what Monarch intended to do regarding a reluctance to send testing data and lingering concerns about payments owed and contracts to be negotiated. (*Id.*)

In the end, in Monarch's view, the new equipment never matched expectations:

Q. What is the failed performance record that you're aware of?

A. When I [Monarch owner Kable Munger] was sold the—the patented process and the technology, it was represented to me that it would perform a certain way, at a certain cost and all that kind of stuff, and it would do certain things. And it was also represented to me that it was being done commercially that way and they were selling me something that they had experience in and a lot of other—in other area—in other plants, and I believe that that was false.

Q. Okay. And why do you believe that was false?

A. Well, we're still looking into it. But, for example, you know, one of the reasons is—for example, that McKenzie, okay, I was told that there was a—there was a—they tried to dry blueberries there, and it wasn't very successful. And they told me, "Don't worry about it. He doesn't know"—you know, "he doesn't know what he's talking about. He just ran some bad product. It wasn't good berries, so that's not"—you know, "don't worry about it. It's going to do"—you know, "exactly what we're telling you it's going to do."

(Dkt. No. 79-10 at 4.) In Goodnature and Wettlaufer's view, one factor in Monarch's disappointment was the extent to which Monarch deviated from the plan set up in the contractual documents. The contract called for Monarch to purchase certain equipment and to build and design

15

its own plant.  Monarch ultimately did not purchase all of the specified equipment and purchased certain

pieces of equipment from other sources.  (Dkt. No. 79-33 at 8.)  Monarch's motive for mixing and

matching parts suppliers is not clear, though Goodnature appears to have endorsed any improvisations:

> Q. We look at Exhibit 3 Goodnature is supposed to be selling a package of core
> technology for the infusion plant, right?
>
> A. Yes.
>
> Q. And then Monarch is picking and choosing some things and saying, well, we're
> going to buy this, not from you but from someone else, right?
>
> A. Yes.
>
> Q. It wasn't discussed at all how that would impact Goodnature's obligations, if at
> all?
>
> A. No.  Because we had discussed with Goodnature if we could and if they have any
> problem with that equipment.  We asked if that would be something that
> would work.  If they felt that, no, don't do it, it's not going to work, then it
> wouldn't have happened.  So I don't think that was discussed, because we
> had discussed, "Can we use this?  Can we do this?" to Goodnature.
>
> Q. So I understand, to the extent any equipment was purchased—any of the core
> technology was later purchased from another source, Goodnature blessed
> every . . . (transcript cut off).

(Dkt. No. 81-9 at 7.)  Monarch further did retain its own engineering firm, a company called IES,

but eventually settled on a design process other than what Goodnature had outlined.  (Dkt. No. 79-

33 at 8.)  In fact, Monarch at one point instructed IES not to communicate with Goodnature.  (*Id.*;

*see also* Dkt. No. 79-27 at 2.)  As for IES's role,

> IES provided a lot of other engineering.  We did things with the building.
> We did things with the heating and cooling of the building, taking the process
> parameters provided by Goodnature and adding those to make their refrigeration
> system or the glycol system large enough.  Size and scope of all the utilities, utility
> piping, air, water, we did the—all the CIP piping, the process piping, the layout of
> the equipment in the room.  I'm sure I'm omitting some things.  I'm—that's not an
> all-inclusive list but that [is] a good start.

(Dkt. No. 81-10 at 4.)

Other factors played a role as well. Another factor in Monarch's disappointment might have been simple education about the technology. "We didn't have a good idea of how the process—it didn't make any sense compared to the patent. Dale [Wettlaufer] came and went over the actual process and the different types of things that you could do. He talked about warm and cold. He talked about the infusion process itself, how that took place. We were very impressed." (Dkt. No. 79-13 at 7.) Yet another factor might have been that, after sample testing and shortly after signing a contract, the drying system had to be increased in size beyond the specifications set in May 2010. (*See* Dkt. No. 86-17 at 10 ("Well, the, the conversation would have been that the size of the machine was changed due to a change in the specification of the product being—being run, and therefore the machine had to grow, because the product that was approved was different than what we originally sized the machine for."); Dkt. No. 86-18 at 10; *see also* Dkt. No. 94-3 at 195–202 (email exchange about the change); Dkt. No. 96-3 at 113.) In an email message to CPM dated September 7, 2010, Monarch owner Kable Munger expressed frustration about the apparent need to revise a contract that he had signed just a few months earlier:

> I just spoke to Maz [Ahmadi, a Monarch employee] and he told me that you [CPM] told him that you can't move forward without the revised contract. It is important that Proctor [CPM] understand that we have a contract and if Proctor wants to revise it then Proctor needs to explain why? You still didn't answer that question.
>
> I still want to reiterate that putting the project on hold is not [an] option for me. If you think the contract needs to be revised then let's meet as soon as possible so I can understand your position.
>
> In my opinion Munger didn't have anything to do with the delay but let's not get into that now and let's try to understand what happened. Please understand that every day I am not running the plant, I am losing a lot of money.
>
> How can you just make changes to a contract and expect me to sign it without [an] explanation. You still didn't forward all the communications between Goodnature and Proctor so I can understand what happened. Please don't keep me in the dark anymore because I want to move this project forward.

(Dkt. No. 96-3 at 114.)

In June 2015, Monarch forensic accounting expert Susan Thompson observed about 400,000 pounds of packaged and wrapped product at Monarch's facility that showed signs of crystallized sugar. (Dkt. No. 86-14 at 2.) Thompson also noted in her report that the called infusion process was taking longer than the intended 72 hours and not yielding the target Brix value of 45. (Dkt. No. 86-15 at 5.) Thompson noted that the delays in the cold infusion process were what prompted Wettlaufer to suggest that Monarch switch to warm infusion. (*Id.* at 6.)

Defendants attempted several remedies to maintain their relationship with Monarch. Monarch's expert, Tom Aurand, visited Monarch's facility and recommended certain improvements, but those recommendations were never implemented. (Dkt. No. 79-12 at 3.) Other changes were made in details like pipes, valves, evaporator tanks, and water flushing. ((Dkt. No. 79-18 at 13.) Technicians visited Monarch's facility for troubleshooting. In a field report dated February 1, 2012, CPM noted some problems with the installation of the drying equipment. (Dkt. No. 86-3 at 2.) In April 2014, CPM representatives visited Monarch's facility and made some improvements in the infusion process by adjusting the distribution and loading of the berries. (Dkt. No. 86-17 at 14.) Wettlaufer himself refused to visit Monarch unless Monarch paid his airfare. Wettlaufer also has hinted that, in his view, problems with the equipment were Monarch's fault because Goodnature had no say in the design of Monarch's facility:

> Q. Did you ever refuse to come out to Monarch unless they paid for your airfare and time?
>
> A. Yes.
>
> Q. And why was that?
>
> A. Because not only was [Monarch] not paying the royalties that were long since due, but they were asking for me to help them with a plant that somebody else designed, and now [Monarch] was asking me to come out when the dryer company people came out there to troubleshoot their dryer, and they weren't even willing to pay my airfare out there.

18

(Dkt. No. 75-3 at 63; *but see* Dkt. No. 79-11 at 10 ("Q. Sure. With respect to the building, did either Goodnature or Mr. Wettlaufer design your [Munger's] building? A. I'm not sure what you mean by design. Q. Sure. Did they tell you what kind of countertop to put in? Did they tell you what kind of floor to put in? Did they tell you how tall to make it? A. Yes.").) During Munger's deposition, Goodnature and Wettlaufer also hinted that the quality of Monarch's berries could have led to variations in yield:

> Q. Okay. Did you—by the way, did you have an understanding that the yields could vary depending on the variety of the fruit?
>
> A. Yes.
>
> Q. Could the yields vary depending on when the fruit was harvested?
>
> A. Depending on when the fruit was harvested?
>
> Q. Yes.
>
> A. I guess.
>
> Q. Could the yields vary depending if the fruit was, you know, good fruit or bad fruit, so to speak?
>
> A. If you didn't have the—I guess the appropriate fruit, yes.
>
> Q. You ever hear of the concept garbage in, garbage out?
>
> A. I have.
>
> Q. Would that—would that apply to that scenario? If the fruit's bad, it might not infuse well?
>
> A. If you put garbage in, you would get garbage out.

(Dkt. No. 79-11 at 3.) In turn, Monarch learned to approach Wettlaufer's advice with some skepticism:

> Q. Your impression of your dealings with Mr. Wettlaufer, was he trying to help get the process going satisfactory to Monarch?
>
> MR. HOPPE: Objection, calls for speculation. You can answer.

THE WITNESS [Andy Garcia, technician at Monarch]: I think that, yeah, he wanted to try and help. He would offer advice, but, again, that advice was—just [to] be blunt about it. The advice was not very good. It was contradicting. It would send us on rabbit trails that would more or less waste our time on certain aspects. So he was the guru—or so we thought—but what he was giving us was not helping us. It was not fixing all of these problems that we had. It was not getting us to, ultimately, the end goal of a product that we could sell and make money off of.

(Dkt. No. 79-19 at 7.)

By February 2015, Monarch stopped production at the facility. (Dkt. No. 86-10 at 2.) The facility has not run since. Nonetheless, when Monarch conducted sample testing in the spring of 2014, it found no leakage from the berries or other production problems. "There was nothing unusual about the berries. They were typical for what we had been producing." (Dkt. No. 86-12 at 3.) Monarch never offered to return the dryer to CPM. Monarch received very little if any negative feedback from customers:

Q. Had any product been returned to Monarch for any defect at any time? Product you sold and it came back and was rejected by the customer?

A. No product was ever returned.

Q. There's never been product rejected by a customer?

A. Well, we had one customer that we sold product to that ended up not taking his contract because the product was too crystallized.

(Dkt. No. 79-17 at 9; *but see* Dkt. No. 94-3 at 134–35 (email exchange with customer unhappy about crystallization).)

In hindsight, Monarch has taken a critical view of Goodnature's representations leading up to the Licensing Agreement. At his deposition in 2015, Wettlaufer himself took issue with representations that Goodnature sales representative Christopher Kelley made to Monarch about the nutritional value of sweetened dried blueberries that went through Goodnature's infusion and drying process. (Dkt. No. 75-3 at 60.) The representations, according to Wettlaufer, were "totally

not something that should have been sent out." (*Id.*) Goodnature could not substantiate the representations. (*Id.* at 63.) Wettlaufer asserted, however, that the representations were mere puffery not worthy of reliance by a sophisticated client like Monarch. (*Id.* at 61.) Monarch's expert, Tom Aurand, has expressed more detailed concerns about Goodnature's representations. According to Aurand, among other points, Goodnature's cold infusion process was a major selling point, but the process also involved using frozen fruit and thawing it out at significantly higher temperatures. The exposure to higher temperatures, in Aurand's opinion, would negate any purported benefits of the lower-temperature cold infusion. (Dkt. No. 75-3 at 68–69.) Goodnature also highlighted that any granular sugar used would remain in a "gelatin state" to avoid giving the dried fruit a gritty texture. Aurand criticized this representation as vague and noted that gritty crystallization did occur with Monarch's final product. (*Id.* at 69.) As for representations about nutritional value, "[t]here was no data presented supporting the differences in nutrient contents between a cold and warm infusion process." (*Id.* at 70.) The absence of data in the Goodnature sales pitch might have resulted from the place that cold infusion currently has in the industry; Aurand has asserted that he "is unaware of any commercial systems that are using a cold infusion (≤70° F) system today." (*Id.* at 71.) Goodnature, in Aurand's view, helped create the problem through a general lack of careful data collection and analysis:

> Documented and scientifically sound data was a major short coming in the implementation of the Wettlaufer process at Monarch Nut. As noted throughout the proceeding, historical data was not available for analysis which limits the analysis of current conditions against a historical database. Hence the need to run test batches to predict the optimized conditions for each lot of incoming fruit.
>
> This lack of scientific discipline was noted throughout the implementation process. Several references were made that the scientific method was follow (Paige Wettlaufer deposition, p25; Wetlaufer deposition 19-29-15, p 98 & 101 ). Following the scientific method was notably lacking especially in the areas of record keeping and the following of good scientific methodology. A prime example would be the inability to readily identify the technologist responsible for running experiments, the

> methodology used in those experiments and the retention of experimental result for later review or use. This lack of record keeping was a major shortcoming in the development, implementation and evaluation of the Wettlaufer process used on blueberries. Considering the scope, complexity and magnitude of the dollar outlay of this project, the scientific discipline and scientific data is not be considered robust enough for proceeding with this project. This especially true considering the technical naivete toward infusion and drying by the Mungers and the Monarch staff.

(*Id.* at 78–79; *see also* Dkt. No. 75-3 at 108 ("For Goodnature to make statements to Monarch Nut claiming that their process provided sweetened dried blueberries which are superior to other sweetened dried blueberries with regards to nutritional value, they should have provided supporting data.").)

Monarch expert Steven Klus has raised other concerns about Goodnature's representations leading up to the purchase of equipment. Among other opinions from Klus, the cost estimate spreadsheets that Goodnature had prepared in July 2009 understated costs and overstated revenues that would result from the proposed production plan. (Dkt. No. 75-3 at 87.) The cost estimate spreadsheets also mismatched labor needs and costs—calculated on a 20-hour day—to a plant that would operate in some capacity 24 hours a day. (*Id.* at 87–88.) The September 17, 2009 addendum to the Agreement promised a yield of 321,000 gallons of single strength blueberry juice as a result of the infusion process, but Klus criticizes Goodnature's disclosure in 2013 that any juice created would need further processing to arrive at a finished product. (*Id.* at 90.) "If in 2013 Dale Wettlaufer did not have data to support the production capability stated in the original document, then he did not have sufficient data in 2009. This reduction in potential income significantly reduced the income potential for Monarch Nut and it also [led] to additional equipment expenditures to process the juice." (*Id.*) Additionally, according to Klus, Goodnature knew as early as August 2009 that cold infusion would take longer than the proposed 72 hours to reach the desired Brix values of 40–45 degrees. (*Id.* at 91.) At his deposition, Klus reviewed sample yields that

the equipment produced in 2012 while running cold infusion. (Dkt. No. 79-23 at 5.) While the times required for the samples was not known, Klus agreed that the equipment reached Brix values of 40 degrees or more many times. (*Id.* at 6.) This information is not necessarily inconsistent with a page of infuser data that Monarch included in its motion papers. (Dkt. No. 94-3 at 131.) The information appears to have been collected on August 12, 2013. The page does not specify cold vs. warm infusion. Across blueberries sizes, though, the information shows average infusion hours around or under 72 hours and average Brix values around 40 degrees:

|       | #of Infusers | Percent By Size | Avg. lnfus. Hours | Average Yield |
|-------|--------------|-----------------|-------------------|---------------|
| 9's   | 16           | 18.2%           | 71.54             | 42.6%         |
| 13's  | 36           | 40.9%           | 72.53             | 39.4%         |
| 15's  | 24           | 27.3%           | 71.17             | 36.0%         |
| 17's  | 12           | 13.6%           | 69.08             | 37.1%         |

(*Id.*)

CPM expert Dan Poirier has formed his own opinion of how the drying system performed and what might have caused any deviations in performance from contracted specifications. According to Poirier, CPM's drying system met industry standards for sugar infusion when installed. (Dkt. No. 86-1 at 13.) The drying system had some initial problems related to how the berries were being prepared for drying and then fed into the system (*id.* at 20–21), but those problems were corrected. Among the initial problems was an apparent mismatch between desired system specifications for cold infusion and the test sample that Monarch preferred for those specifications, which was based on warm infusion. (Dkt. No. 78-3 at 4.) Another initial problem was a misunderstanding about what CPM meant by "1,100 pounds of fruit per hour" in its system quotation. CPM meant that Monarch could feed up to 1,100 pounds of fruit per hour into the

dryer; Monarch at one point understood the rate to mean the amount of final product that could be finished per hour. "No discharge rate was specified by the contract terms." (*Id.* at 6.) Poirier pinpoints discrepancies in berry size as the most likely factor that affected processing rates. (Dkt. No. 86-1 at 16–17.) When Monarch and CPM were testing samples of blueberries, they used berries that averaged 9–13 mm in diameter. CPM matched that berry size to a particular dryer size that would meet Monarch's processing needs. (*Id.* at 19.) At some point, though, Monarch likely started using larger blueberries of a diameter greater than 13 mm. (*See* Dkt. No. 86-16 at 19 ("Q. Did you learn that berry size is an issue in this matter? A. Correct, yes. Q. And when did you learn that? A. When I saw how big their huge berries of 17 millimeters were."); *see also* Dkt. No. 94-4 at 4 ("More than 40% of the blueberries grown by Munger Farms are considered a large size, 15 mm or above. 5% of the blueberries grown by Munger Farms are considered small, or 9 mm or below."); Dkt. No. 98 at 3 ("I [Monarch owner Kable Munger] also learned that the dryer would not appropriately dry the 15 mm–17 mm sized large berries that are over 80% of our blueberry crops harvested at Munger Farms.").) The larger blueberries would have slowed down the dryer system and prevented the system from processing dried berries at the contracted rate:

> Q. And so what did those—what did the size how did the size impact the drying curve?
>
> A. Well, the drying curve was completely different than the drying curve that I had developed in the lab. It did not look at all similar.
>
> So although some of the sizes, like the 11s and 13s, dried right on top of each other, there was really—or the 9s and the 13s, there wasn't really a whole lot of difference. When we went to 17, we did see longer drying times.
>
> Q. Okay. And did you have any discussions with Eric Long at any point in time whether or not he had knowledge that the berries that were being dried at Munger were large berries?
>
> A. No.

(Dkt. No. 86-16 at 23.)  For at least the first test infusion in May 2012, Monarch attested to using

9 mm blueberries.  (Dkt. No. 86-11 at 3; *see also* Dkt. No. 86-16 at 32, 35 (proper drying observed

with 9 and 13 mm berries, different results with 17 mm)).)  Poirier has asserted that at some point,

Monarch became aware of the importance of berry size:

> Monarch has conceded that when it ran berries which were 13 mm or
> smaller, it was able to dry the infused berries at the contracted rate.  Rick Meredith
> testified in this matter that "if it was less than half inch IQF, then we could hit target
> yield".  Exhibit I at page 120.  Ms. Geck likewise found in her on-site testing that the
> 1,100 pound infeed rate was being achieved with the 9 mm and 13 mm berries.
> Exhibit M at 222.

(Dkt. No. 78-3 at 6.)

Thompson's forensic accounting report put forth an opinion about Monarch's lost income.

In short, Thompson attributed significant damages to lost sales from inferior product and to costs

that Goodnature and Wettlaufer caused Monarch to underestimate.  Thompson estimated total 2012

damages at over $7 million; 2013 damages at over $13 million; 2014 damages at over $6 million;

2015 damages at nearly $8 million; and 2016 damages for half the year at approximately $1.5 million.

(Dkt. No. 86-15 at 8–12.)  Thompson further estimated a small amount of mitigation from the sale

of discounted, crystallized product; this mitigation was offset by interest expenses; the depreciated

value of scrapped equipment; and lost sales from an abandoned plan to ramp up eventually to 18

infusers.  (*Id.* at 12–13.)  Thompson estimated these further damages at roughly $42 million.  (*Id.*)

Thompson rested her analysis of lost sales at least in part on oral representations from Munger

about the possibility of selling product to Costco.  (Dkt. No. 79-20 at 7–8.)  Thompson never saw

documentation of an opportunity to sell to Costco.  (*Id.* at 8.)  Monarch additionally explained some

of its calculations as follows: "The plant cost in excess of $15,000,000 to build and currently has no

economic value.  Furthermore, the plant has been shut down because of the failure of the

Goodnature process. Thus, the economic loss associated with the plant shut down is in excess of $5,000,000 and continues to increase on a daily basis." (Dkt. No. 79-24 at 6.)

### C. Monarch commences this litigation.

This case began in the Eastern District of California. (*See generally* E.D. Cal. Case No. 14-CV-1017.) One event occurred during the California phase that has some bearing on the pending motions, and that event is the order of December 4, 2014 that directed transfer here. (Dkt. No. 86-4); *see also Monarch Nut Co., LLC v. Goodnature Prod., Inc.*, No. 1:14-CV-01461 AWI, 2014 WL 6892713 (E.D. Cal. Dec. 4, 2014). The California court directed transfer because Quotation 1940, as incorporated into the Licensing Agreement, "identifies the courts of Buffalo, New York as the venue for all disputes regarding interpretation. Although the Quotation's forum selection clause does not use the phrase 'in the courts of,' the Court does not find ambiguity." *Monarch Nut*, 2014 WL 6892713, at *2. To find the forum selection clause applicable, the California court decided that "the LRA [the Licensing Agreement] attached the Quotation as an addendum, and expressly referenced the Quotation as part of a paragraph that explained when an exclusive license arose. The Quotation is not separately signed apart from the LRA, and the Quotation states that it does not become effective until Plaintiffs accept it. The Quotation is expressly a part of the LRA, and has no meaning apart from the LRA other than as an offer. Given the nature of the LRA and the Quotation, the LRA and the Quotation are not separable, but are entire, and should be read together." *Id.* (citations omitted).

Following transfer to this District, Monarch filed the current operative pleading, the first amended complaint, on August 1, 2016. (Dkt. No. 59.) The amended complaint contains eight claims. In the first claim, Monarch accuses Wettlaufer of breaching "a duty to exercise reasonable care and skill in the design and testing of the infuser system and core technology package" (*id.* at 12),

leading to professional negligence.  In the second claim, Monarch accuses Goodnature[5] and Wettlaufer of common-law fraud and deceit with respect to the infusion equipment.  According to Monarch, Goodnature and Wettlaufer "had an obligation to disclose to Plaintiffs, and concealed and failed to disclose to Plaintiffs, the fact that the production capabilities, yield guarantees and performance expectations they had provided to Plaintiffs were false, entirely unrealistic and unable to be fulfilled based on then-existing industry standards as well as past performance, facts and information (including failed infusion and dry-down testing and failed performance record of the GOODNATURE processes, methods and equipment in use at other companies) that then were not known to Plaintiffs or easily retrieved."  (*Id.* at 13.)  In the third claim, Monarch accuses CFM of common-law fraud and deceit with respect to the drying equipment.  The language explaining CFM's obligations is identical to the language quoted above from the second claim.  In the fourth claim, Monarch accuses all defendants of negligent misrepresentation.  "When the Defendants, and each of them, made the aforementioned misrepresentations, each of them committed these wrongful acts and omissions negligently and carelessly and, in doing so, none of the Defendants had any reasonable grounds for believing the misrepresentations hereinabove alleged to be true."  (*Id.* at 18–19.)  In the fifth claim, Monarch accuses all defendants of a breach of express written warranties upon which it relied.[6]  According to Monarch, defendants made express written warranties

---

[5] Monarch included 100 John Doe defendants in this and other claims.  "Plaintiff had the opportunity to learn the names of the John Doe defendants through discovery, but failed to do so.  Plaintiff has not identified the John Doe defendants or served them, and the Court has no jurisdiction over them."  *Barclay v. Poland*, No. 03-CV-6585 CJS, 2013 WL 5703176, at *2 (W.D.N.Y. Oct. 17, 2013).  To the extent necessary, then, the Court recommends dismissing the John Doe defendants.

[6] Incidentally, while Monarch has no claim in the amended complaint called "breach of contract," Goodnature and Wettlaufer have construed the fifth claim as a breach of contract claim.  At oral argument, Goodnature and Wettlaufer confirmed that they are not challenging this claim in their motions.  (Dkt. No. 119 at 18 ("The fifth cause of action, which is their breach of contract claim, we've not moved on.  We think we fully performed, they say we didn't, I recognize at the outset that's a factual issue.").)

"including, but not limited to, warranties of the fitness, form and function of the equipment, processes apparatus and systems, and lower production costs, as set forth in the introductory allegations." (*Id.* at 19.) In the sixth claim, Monarch accuses all defendants of a breach of implied warranties. "Plaintiffs relied on the skill and judgment of Defendants, and each of them, and used the infusion equipment, infusion processes, two-stage dryer, dryer processes, and related apparatus and systems in their reasonably intended and foreseeable manner." (*Id.* at 21.) In the seventh claim, Monarch accuses all defendants of strict product liability. According to Monarch, defendants "knew or reasonably should have known that the infusion equipment, infusion processes, two-stage dryer, dryer processes, and related apparatus and systems and its component parts would be sold to and used by members of the general public, and specifically Plaintiffs, for the purpose of berry infusion and drying; and that said Defendants knew, or reasonably should have known, that the persons who would purchase said infusion equipment, infusion processes, two-stage dryer, dryer processes, and related apparatus and systems and component parts, specifically Plaintiffs, were without the knowledge to conduct an inspection to discover the latent defects set forth herein." (*Id.* at 23.) In the eighth claim, Monarch accuses all defendants of common-law negligence. According to Monarch, defendants "each knew or should have known that if the [equipment in question] were not properly, adequately and/or completely manufactured, designed, engineered, assembled, installed, constructed and/or maintained, the infusion equipment, infusion processes, two-stage dryer, dryer processes, and related apparatus and systems would be defective and not be of merchantable quality, and would not be suited for its intended purpose." (*Id.* at 27.)

Goodnature and Wettlaufer filed their answer to the amended complaint on August 30, 2016. (Dkt. No. 60.) The answer contains seven counterclaims against Monarch. In the first counterclaim, Goodnature and Wettlaufer accuse Monarch of breach of contract. Under the

Agreement, according to Goodnature and Wettlaufer, Monarch received no guarantees as to product yields and received license rights and equipment for which it has not paid. (*Id.* at 13–14.) In the second counterclaim, Goodnature and Wettlaufer assert that "Plaintiffs are in material breach under the License, have not paid any of the amounts due thereunder, and the License must be revoked and Plaintiffs permanently enjoined from using the License and/or the technology licensed thereunder." (*Id.* at 15.) The third counterclaim states that "Monarch Nut must be directed to prepare and submit an accounting of the weight of and revenue from actual production from the goods sold by Goodnature." (*Id.*) In the fourth counterclaim, Goodnature and Wettlaufer make another accusation of breach of contract against Monarch. "After giving all due credit to Monarch Nut for payments due to Goodnature for the services rendered and equipment sold by Goodnature to Monarch Nut, there remains due and owing from Monarch Nut approximately $115,000 for services rendered and goods delivered to and accepted by Monarch Nut but yet to be paid for by Monarch Nut to Goodnature." (*Id.* at 16.) The fifth counterclaim demands $234,564 from Monarch in cancellation fees that Monarch incurred when it repudiated its obligation to finish purchasing infusion and drying equipment. (*Id.* at 17.) In the sixth counterclaim, Goodnature and Wettlaufer accuse Monarch of failing to pay rent for a laboratory infuser. (*Id.*) In the seventh counterclaim, Goodnature and Wettlaufer accuse Monarch of failing to pay $46,575.66 in shipping charges. (*Id.* at 18.) Monarch answered the counterclaims on April 2, 2018. (Dkt. No. 82.)

CPM answered the amended complaint on October 12, 2016. (Dkt. No. 61.) CPM's answer contains a number of affirmative defenses but no counterclaims.

On March 30, 2018, the parties filed their respective pending motions. The motions raise numerous issues that the Court cannot summarize neatly here. Some of the issues affect multiple

motions and will be addressed in their own subheadings below. Otherwise, the Court will address each motion separately.

## III.  DISCUSSION

### A.  *Summary judgment generally.*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

### B.  *The contracts are integrated and enforceable.*

The parties have raised several issues pertaining to what agreements they made with each other and what language in those agreements governs the relationships. The Court should clarify the contractual agreements between the parties before addressing any other issues.

With respect to the relationship between Monarch, Goodnature, and Wettlaufer, the parties memorialized their relationship through a formal contract, and that contract was the Licensing

Agreement with Quotation 1940 incorporated. The law of the case doctrine supports this conclusion. "The law of the case doctrine, while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (internal quotation marks and citation omitted). Here, the California court already examined the Licensing Agreement and Quotation 1940 and concluded that they formed a unitary and enforceable contract. The parties have not presented any intervening circumstances or clear error that would warrant revisiting the California court's conclusion. That the conclusion came from a sister court in another district makes no difference. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) ("Federal courts routinely apply law-of-the-case principles to transfer decisions of coordinate courts.") (citations omitted). Even if the California court had not reached prior conclusions about the Licensing Agreement, undisputed facts in the record would point this Court in the same direction. Following extensive communications and revisions, the parties worked out Quotation 1940. Quotation 1940 subsequently became part of the Licensing Agreement, which required all necessary signatures by October 24, 2009. Through paragraph 14 of the Licensing Agreement, the parties made clear that they reduced all prior communications and intentions to that writing and that amendments would have to be in writing. *Cf. Sengillo v. Valeo Elec. Sys., Inc.*, 536 F. Supp. 2d 310, 313 (W.D.N.Y. 2008) (claim of oral contract barred by merger clause); *Junk v. Aon Corp.*, No. 07 CIV. 4640 LMM GWG, 2007 WL 4292034, at *4 (S.D.N.Y. Dec. 3, 2007) ("[T]he parol evidence rule expressly forbids any consideration of evidence of a contemporaneous or prior oral agreement that modifies or contradicts the terms of an integrated written agreement. A contract which appears complete on its face is an integrated agreement as a matter of law.") (internal quotation marks and

citations omitted). In contrast, the Sell Sheet as a writing came about five months later, features no signatures, and contains no language suggesting an amendment to the Licensing Agreement. To the extent that Monarch argues that the Sell Sheet contains promises made orally before March 2010, those oral promises are a nullity if they occurred before October 24, 2009 and concerned the terms of the Licensing Agreement. "To hold otherwise would be to say that it is impossible for two businessmen dealing at arm's length to agree that the buyer is not buying in reliance on any representations of the seller as to a particular fact." *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 600 (N.Y. 1959). Any other oral promises, if they have any impact on this case at all, will have to be addressed as something other than a modification of the Licensing Agreement. The Licensing Agreement thus is a fully enforceable contract; to the extent that the parties' motions require examining the Licensing Agreement, the Court will assess those motions from this perspective.

With respect to the relationship between Monarch and CPM, the Court concludes in a similar way that the parties executed Revision 6 as a complete and final contract. Revision 6 contains a table of contents with all of the sections in all 24 pages that the parties contemplated. (Dkt. No. 87-6 at 4.) *Cf. Thomas v. Pub. Storage, Inc.*, 957 F. Supp. 2d 496, 500 (S.D.N.Y. 2013) (compelling arbitration where, *inter alia*, the plaintiff signed for receipt of an employment handbook with "Arbitration Agreement" in the table of contents). Revision 6 contains the necessary signatures from the parties in signature blocks that contain language such as "proposal authorized by" and "proposal accepted by." (*Id.* at 18.) Revision 6 has a provision that explicitly makes the document the complete agreement between the parties, with no prior agreements in effect and no modification allowed except in writing. (*Id.* at 23.) Monarch has tried to argue that a shortened version of Revision 6, minus the Section G labeled "Terms and Conditions," is the actual contract that all parties executed. (Dkt. No. 96-3 at 85–102.) The argument is undermined by the appearance of

32

Section G in the table of contents of Monarch's proposed shortened version. In fact, Monarch's proposed shortened version would end at Section C, but the parties would have had no reason to list Sections D through G in the table of contents unless either they fully contemplated and agreed to those sections, or unless they at least made some kind of notation in the table of contents to strike the listing of those sections. The Court rejects Monarch's argument as implausible.

Revision 6 thus is fully enforceable; as with the Licensing Agreement, to the extent that the parties' motions require examining Revision 6, the Court will assess those motions from this perspective.

### C. The contracts will be viewed under New York law.

Having settled the identification of enforceable contracts, the Court turns briefly to the issue of what law applies when reviewing those contracts. With respect to the Licensing Agreement, the parties in paragraph 17 chose Buffalo, New York as their venue for "[a]ll disputes regarding the interpretation of this contract" and chose "the laws of this place." (Dkt. No. 94-3 at 68.) Quotation 1940 additionally contained a paragraph with an express designation of "the laws of the state of New York, including the Uniform Commercial Code as enacted by the state of New York." (*Id.* at 84.) "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) (citation omitted). The Court sees nothing in the record that would put the applicability of these provisions in doubt or otherwise cast any doubt on the applicability of New York law. Under New York law, there is a distinction between a choice of law provision for a contract and a determination of which law will govern a claim of fraud arising incident to the contract. *See Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)

33

(citations omitted). To the extent that such a distinction comes into play here, the Court is again persuaded by the occurrence of a court in California closing out any further role for California in this case. The Court thus will proceed interpreting the Licensing Agreement (with Quotation 1940 incorporated) under New York law. The choice of law for Revision 6 is a little more interesting because of the added variable of litigation conduct. Paragraph 12 of Section G contains the unambiguous assertion that "Pennsylvania law applies to this Agreement, and governs its construction and interpretation." Nonetheless, CPM argues that it has acquiesced to the application of New York law. (Dkt. No. 109-4 at 2.) CPM's principal memorandum of law, apart from Supreme Court cases, cites exclusively to authorities within the Second Circuit or the New York State court system. (Dkt. No. 78-34.) *See Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) ("[E]ven when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law.") (citation omitted); *accord, e.g., Juergensen Def. Corp. v. Carleton Techs., Inc.*, No. 08-CV-959A, 2010 WL 2671339, at *11 n.5 (W.D.N.Y. June 21, 2010). Monarch argues that California law somehow applies, but Monarch's argument rests in part on a supposedly shortened version of Revision 6 that the Court has rejected as implausible. Accordingly, the Court concludes that New York law will apply to Revision 6 as well.

### D. Monarch's motion for partial summary judgment on some defense counterclaims (Dkt. No. 75).

Through this motion, Monarch seeks summary judgment on the first, second, and fifth counterclaims filed by Goodnature and Wettlaufer. In short, Monarch believes that it does not have to finish paying for the infusion and drying equipment and does not owe cancellation fees because the equipment never operated as promised. More specifically, Monarch asserts a discrepancy between Goodnature and Wettlaufer's promises, and their internal documents, to the effect that its

production target for processed fruit required almost 1 million more pounds of raw fruit than promised. (Dkt. No. 75-1 at 8.) At least twice, according to Monarch, production cycles required at least 159 hours compared to the promised 72 hours. (*Id.*) Monarch argues that the drying equipment did not even match the cold infusion process that it wanted to use. "The dryer was designed for *warm infusion only*—Monarch was not advised of any of this, so it did not know of any operational or production distinctions between warm and cold infusion and drying processes." (*Id.* at 9.) Monarch argues further that Goodnature and Wettlaufer failed to perform adequate testing of the processes that they sold, including testing that would have uncovered the extent of expected variability or deviation from intended results. (*Id.* at 10.) Other problems arose, in Monarch's view, from Goodnature and Wettlaufer's failure to train Monarch personnel and from the inability of the equipment to maintain proper sanitation:

> First, the "scarifiers" (which "score" the fruit) were subject to the collection of food material and the development of microbial contamination. (SMF No. 30) Second, the design of the infusion vessels did not permit proper sanitation of the infusion nozzles. (SMF No. 31)

> The buffer/surge tank system posed a variety of issues. Its design creates possible operational contamination. (SMF No. 32) (The design of the buffer tank also did not permit the ability to meter production out of the buffer tank that feeds the oscillating conveyer, requiring Plaintiff to have workers manually spreading the product out before it went into the dryer. That resulted in damage to the berries themselves, which impacted the finished product yield and quality. The paddle wheel of the buffer tank did not function properly, resulting in uneven amounts of berries in the incline conveyor compartments; producing delays and the inability to reuse the infusers on a timely basis.)

(*Id.* at 11–12.) Overall, in light of the multiple design and performance failures that it perceived from the equipment, Monarch believes that "[t]here was no scientific basis to support the claims made for use of the process for blueberries." (Dkt. No. 75-1 at 8.) As Monarch stated a little differently in its reply papers,

> What does it mean to say—in a purchase contract—"it is reasonable to expect" a yield of a certain percentage of net blueberries by weight after processing raw berries through the Defendants' cold infusion system? Anything? Nothing? What could have been the purpose of inclusion of such a statement in the contract if not to induce Plaintiffs' reliance on a projected yield of 40–45%? That was the precise purpose and it cannot be seriously disclaimed.

(Dkt. No. 106 at 3.)

Goodnature and Wettlaufer oppose Monarch's motion as mostly a restatement of the allegations in the amended complaint. Goodnature and Wettlaufer criticize Monarch for using oral evidence and expert opinions to try to circumvent the plain terms of the relevant contractual papers. (Dkt. No. 92-30 at 7.) Goodnature and Wettlaufer then make several arguments for why they and not Monarch are entitled to summary judgment on the counterclaims in question. For the first counterclaim, Goodnature and Wettlaufer emphasize that the contract called for Monarch to make certain royalty payments and that they fulfilled all of their contractual obligations. Any references in the contract to a 72-hour processing period referred only to infusion and not drying. Any discussion of cost estimates was conceptual only and never made part of the contract. Goodnature and Wettlaufer never promised any particular yield, let alone one of 50 percent or more. No testing obligations appear in the contract, and much of Monarch's concern about drying would be directed to CPM, which sold the dryer. Goodnature and Wettlaufer also stick to the contractual language for issues related to training, juice volume, and food safety; they also point to Monarch's inability to show any evidence of actual food contamination. For the second counterclaim, Goodnature and Wettlaufer assert that the counterclaim is a distinct cause of action and that the contractual language naturally leads to an injunction preventing Monarch from using any patented technology. For the fifth counterclaim, Goodnature and Wettlaufer track the contractual language regarding restocking charges. Under the contract, Monarch owes the restocking charge for failure to follow through on purchases of additional equipment.

Resolving the motion requires keeping in mind what rights actually are at stake in Goodnature and Wettlaufer's first, second, and fifth counterclaims. In the Licensing Agreement, Goodnature and Wettlaufer gave Monarch several layers of rights to allow it to use the Patented Technology. The basic level of rights consisted of a period of five consecutive years to use the Patented Technology exclusively. This five-year window would begin with either the first payment of a $100,000 annual royalty fee or, alternatively, the placement of an order of at least six infusers as specified in Quotation 1940. (Dkt. No. 94-3 at 66.) Monarch has admitted purchasing six infusers, which would have relieved it of royalties for the first two years of the five-year exclusive period. (Dkt. No. 82 at 2.) The Court will use October 24, 2009 as the date of placement of the order, since that is the date of the latter signature on the Licensing Agreement and since the payment schedule under the signatures called for a down payment with the contract signing. (Dkt. No. 94-3 at 68.) Since Monarch did not exercise the option to extend the exclusive period, the exclusive period would have run from October 24, 2009 to October 24, 2014. For up to 12 years after the end of the exclusive period, Monarch had nonexclusive licensing rights in the Patented Technology. (*Id.* at 66.) The price for the nonexclusive licensing rights was two cents per dried pound per year for the first four years and then one cent per pound for the remaining years. If Monarch failed to make payments then Goodnature and Wettlaufer had the option to serve written notice that it was terminating the licensing rights. (*Id.*) Monarch ceased using its infusing and drying facility in February 2015, and the Licensing Agreement was terminated in June 2016, but the Licensing Agreement has no other provisions for cancellation of licensing rights. In short, then, Monarch obtained licensing rights including a time when Goodnature and Wettlaufer would not grant a license to anyone else. In exchange, Goodnature and Wettlaufer would receive payment or equipment orders, plus a promise by Monarch to "use its best efforts to manufacture and use the

Patented Technology in all the civilized countries of the World." (*Id.* at 65.) Since the placement of orders was the criterion for relieving Monarch of certain royalty payments, the performance of any equipment ordered, strictly speaking, had nothing to do with the mutual consideration required to establish a contract for licensing rights. Additionally, Goodnature and Wettlaufer explicitly made no guarantees about product yield. The only other clarification needed here concerns the fifth counterclaim. Under Quotation 1940, as Monarch ordered equipment, it could not cancel orders except in writing and with a reasonable payment to compensate Goodnature and Wettlaufer for efforts made up to the time of cancellation to prepare equipment for delivery.

Clarifying the exchange made in the Licensing Agreement also clarifies the outcome of Monarch's motion. As part of the Licensing Agreement, Goodnature and Wettlaufer refrained from granting licensing rights to anyone else. That restraint was enough to consider Goodnature and Wettlaufer to have held up their end of the bargain. On Monarch's end, Monarch purchased equipment in lieu of the first two years of royalty payments. The undisputed record shows no other payments for any other years during which Monarch had licensing rights. Monarch has made furious arguments about equipment that it purchased from both Goodnature and CPM; the Court will address those arguments as needed within the context of the other pending motions. For this motion, though, which concerns counterclaims focused only on licensing rights, any arguments about equipment operation are irrelevant. What matters for this motion is that Monarch obtained up to 12 years of licensing rights and paid for two. Monarch effectively resorted to self-help, using non-payment of royalties as leverage in a separate dispute about equipment performance. "[I]t is black-letter law that when one party to a contract materially breaches, the nonbreaching party has two options: it can terminate the agreement and sue for total breach, or it can continue the contract and sue for partial breach. There is, however, no third option allowing the party claiming a breach

to invoke 'self-help' and only perform those obligations it wishes to perform." *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 397–98 (S.D.N.Y. 1999) (internal quotation marks and citations omitted). Monarch also canceled certain equipment deliveries without payment of any amount under the cancellation clause of Quotation 1940, let alone a reasonable amount.

Under these circumstances, summary judgment for Monarch on the counterclaims is impossible. The Court recommends denying Monarch's motion accordingly.

### E. Monarch's motion for partial summary judgment on second claim of its amended complaint (Dkt. No. 76).

Through this motion, Monarch seeks summary judgment against Goodnature and Wettlaufer for common-law fraud and deceit with respect to the infusion equipment. Monarch argues that Christopher Kelley's Sell Sheet of March 19, 2010 contained information that Goodnature and Wettlaufer knew to be false or at least unsubstantiated. "Under the heading 'Nutritional Value,' the Sell Sheet states (in its entirety) that: 'Nutritional values will be verified with your ongoing product testing. History has shown that the combination of low heat and the closed loop system will retain more of the natural nutrients in the final product. We can also expect that polyphenol levels in the fruit will be higher as well.'" (Dkt. No. 76-1 at 4.) In his deposition, Wettlaufer himself repudiated Kelley's representations about nutritional values. Monarch's experts have refuted every other significant piece of information in the Sell Sheet. Monarch goes as far as to clarify "that 'verification' could have been done only *after* the system was installed and running. All these statements were 'fraud'—not because they were objectively false—but because those who made them were subjectively aware there was no reasonable basis for making them." (Dkt. No. 105 at 3.) Kelley's representations bound Goodnature and Wettlaufer, in Monarch's view, thus making them responsible for material misrepresentations upon which Monarch relied. To the extent that Goodnature and Wettlaufer attack the second claim by asserting that the Sell Sheet postdates the

contract, Monarch replies that the Sale Sheet only reduced to writing representations that Kelley made orally before execution of the contract. (*Id.* at 2.)

Goodnature and Wettlaufer oppose the motion in all respects. Goodnature and Wettlaufer do in fact emphasize the timing of the Sell Sheet. The contract between the parties consists of the Licensing Agreement, dated October 24, 2009, and Quotation 1940 Revision 3, dated September 17, 2009 and executed on October 24, 2009. Kelley delivered the Sell Sheet on March 19, 2010, months after the contract took effect. The Sell Sheet, Goodnature and Wettlaufer argue, thus could not have affected Monarch's decision to enter the contract:

> It is axiomatic that the "sell sheet"—which was delivered approximately five months after the Contract was entered into—could *not* have induced Plaintiffs to enter into the Contract. Because Plaintiffs received the "sell sheet" months *after* they executed the Contract, it is chronologically impossible for Defendants to have relied on the "sell sheet" when negotiating their bargain with Defendants.
>
> Further, the "sell sheet" does *not* contain statements of present fact. Rather, the "sell sheet" has no specifics. It contains sales puffery that the infused product made with the Goodnature process is "superior" and then states that Plaintiffs must verify nutritional values by their own product testing. That is it.

(Dkt. No. 93-12 at 4.) The Sell Sheet also could not have created any problems with respect to nutritional values because Goodnature and Wettlaufer told Monarch to perform its own testing for those values. (*Id.* at 10.) Monarch did so. (*Id.*) Apart from the Sell Sheet, "the Contract expressly provides that, except as otherwise set forth in the Contract: (1) Goodnature made *no* other representations of any kind; and (2) any 'representations, promises, warranties or statements' made by Goodnature's 'agents' are *not* to be relied upon and are *not* part of the Contract." (*Id.* at 12.)

Goodnature and Wettlaufer have the better argument here. Monarch's motion is focused entirely on the Sell Sheet. The Sell Sheet issued on March 19, 2010, months after the Licensing Agreement took effect on October 24, 2009. With the Sell Sheet coming months after the Licensing Agreement, Monarch's assertion that it "[relied] on those misrepresentations in entering into an

agreement with Defendants" (Dkt. No. 76-1 at 5) is logically impossible.  Monarch tries to rescue

itself from this impossibility by raising, for the first time in its reply papers, the alternative argument

that "[t]he email transmission of the Sheet by Chris Kelley five months after the agreement was

signed was merely a reiteration of what he and Dale Wettlaufer had told Kable Munger during the

negotiation process."  (Dkt. No. 105 at 2.)  The alternative argument is unavailing for two reasons.

First, "[t]his Circuit has made clear it disfavors new issues being raised in reply papers." *Rowley v.*

*City of New York*, No. 00 CIV. 1793 (DAB), 2005 WL 2429514, at *5 (S.D.N.Y. Sept. 30, 2005)

(collecting cases).  Second, creating a factual dispute about who said what, during a lengthy

negotiation with numerous revisions to draft documents, undermines Monarch's own argument that

it should prevail on undisputed facts as a matter of law.  Accordingly, the Court recommends

denying Monarch's motion.

### F.  *CPM's motion for summary judgment (Dkt. No. 78).*

Through this motion, CPM seeks summary judgment in its favor for all claims that Monarch

asserted against it in the amended complaint.  Anticipating an argument about how many pages

constituted the full contract between the parties, CPM begins with the procedural argument that the

24-page document executed by Monarch on December 21, 2010 and by CPM on January 4, 2011,

Revision 6, "is the fully integrated and final agreement of the parties." (Dkt. No. 78-34 at 7.)  CPM

rejects any suggestion by Monarch that the contract changed based on how many pages Monarch

might have faxed back or based on certain email messages from December 2, 2010 that Monarch

might have faxed back with the contract.  At most, according to CPM, if Monarch intentionally

faxed back fewer than the full 24 pages, hoping to have CPM move forward without the full terms,

then the maneuver constituted a counter offer that never reached a meeting of the minds:

> Monarch claims that its intentional return of the contract without the terms
> of conditions formulates a counteroffer and acceptance because Paul Smith of CPM

signed the signature page after Kable Munger's return of the contract without the terms and conditions. Plaintiff has offered no documentation to support his contention that the standard terms and conditions were objectionable and that they intended to make a counter offer which excluded them. Notably missing from plaintiffs' submission is any explanation as to the continued inclusion of the statement immediately under Mr. Munger's signature that "the standard terms and conditions, attached hereto, are a part of this quotation". (Koch Decl. at Exh X, p. 18). Plaintiff has no explanation as to why the alleged counter offer was not marked to note that it was inclusive of 18 pages and that the signature page was 18 of 18 instead of 18 of 24 pages. Nor does plaintiff have any satisfying explanation as to why there was no dialogue or discussion of the rejection of the terms and conditions that were presented with the budgetary quotations and through each revision up to and including the final contract. To the contrary, at his deposition Mr. Munger agreed that he expected certain contractual elements contained on page 20 would be binding although they likewise were not returned by him to CPM. (Koch Decl. at Exhs. X, H at 236-237).

(Dkt. No. 109-4 at 4–5.) Intertwined with the issue of what constitutes the contract is the issue of what law applies to the contract. CPM insists that it acquiesced to New York law and that the pre-transfer District Court in California said so. (*Id.* at 2.) Alternatively, CPM would point to Pennsylvania law, given the provision in the contract—a provision disputed by Monarch— that refers explicitly to Pennsylvania law.

CPM argues next that any claim by Monarch explicitly or implicitly based on the terms of the contract are time-barred. The contract gave Monarch up to 18 months to make a contractual claim about the dryer system; New York's Uniform Commercial Code ("UCC") specifies that a claim accrues when a breach occurs regardless of knowledge; and Monarch commenced litigation well after the most generous possible reading of its 18-month window:

> CPM delivered the dryer on February 15, 2011. (*Id.* at Exh. E, 5). August 15, 2012 would therefore be the eighteen month expiration date if calculating from delivery. The dryer was commissioned on February 1, 2012. (*Id.* at Exh. BB; *See* Poirier Decl.). February 1, 2013 would be the expiration date if calculating twelve months from commissioning. The parties' Contract accepts the earlier of these dates, August 15, 2012, as the warranty expiration. [*Id.* at Exh. X, 22, para. 2 (a)].

Uniform Commercial Code § 2-725 (2) directs that:

"[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

Applying the UCC provision that a breach occurs on tender of delivery (February 15, 2011) and the parties' contractually derived one year limitation for commencement of actions, any action based upon breach of warranty would be time barred after February 15, 2012. (Koch Decl. at Exh. E, 5). Even assuming arguendo that the warranty term extended the time period for commencement of litigation until the expiration of the warranty on August 15, 2012, any claim based upon a breach of warranty would have had to have been commenced, at the latest, on or before one year from the expiration of the warranty term, which would have been on August 12, 2013. Given that this litigation was not commenced until August 8, 2014, the matter is untimely even granting plaintiff the most expansive application of the warranty terms.

(Dkt. No. 78-34 at 9.)

Even if Monarch's claims against CPM were timely, CPM argues that they fail for other reasons. The claim for breach of express warranties fails to the extent that it relies on representations outside of the integrated contract. (*Id.* at 10.) Monarch also has not shown any express warranty from the contract that actually was breached. (*Id.*) The claim for breach of implied warranty fails because the contract explicitly disclaims any implied warranties. (*Id.* at 12.) Under New York's economic loss rule, tort claims are duplicative of contract claims unless they implicate a legal duty independent from the contract terms. (*Id.* at 13.) The economic loss rule also exists under Pennsylvania law. (Dkt. No. 109-4 at 7.) CPM argues further that Monarch cannot allege fraud or misrepresentation based on representations of future performance as opposed to present facts. (Dkt. No. 78-34 at 15.) With respect to damages, if Monarch reached a point at which it would be able to collect damages then those damages would not include lost profit and expectation damages; any damages would be limited further by Monarch's acceptance of the dryer and by express limiting

43

language in the contract. (*Id.* at 17–21; *see also* Dkt. No. 109-4 at 12 ("The dryer was used by Plaintiff for four years. Furthermore, Plaintiff cannot now claim that it has rejected the goods, as it remains in possession of the dryer. For this reason, Pennsylvania, as stated above, limits Plaintiff's recovery to the difference between the value of the accepted goods and the goods contracted for.").)

Monarch opposes CPM's motion in all respects. Monarch begins with procedural distinctions between its contract with CPM and its contract with Goodnature and Wettlaufer. According to Monarch, the contract with Goodnature and Wettlaufer had an explicit provision selecting New York law, but the contract with CPM did not. Without a choice of law, California law applies as the law of the place where the contract was to be performed. (Dkt. No. 96 at 2.) Monarch next raises a dispute about what version of the contract with CPM constitutes the final executed contract:

> CPM Wolverine Proctor attempts to dismiss Monarch's position that the agreement is something less than what they claim it is. It states the half-truth that "Plaintiff argues that by the simple act of remitting by fax some but not all pages of the contract that Monarch has accepted some, but not all terms of the contract." (Memorandum of Law, p. 5.) CPM/WP almost makes this sound as if Monarch simply *forgot* to return some of the pages, or that it signed all signature lines, but failed to return some pages containing substantive language. Neither is true. Monarch returned to Proctor an "executed" version of the contract that excluded certain proposed terms and CPM/WP *accepted* the executed agreement *as modified.* Defendant studiously ignores the fact that Kable Munger executed Exhibit 74 on behalf of Munger Farms on December 21, 2010 (Hoppe Decl. at ¶ 8 and ¶ 9, Exhibit H and I), and that Paul Smith, Vice President of CPM/WP executed what Munger returned by fax—the shortened version of the agreement, absent the terms to which Monarch did not assent—on January 4, 2011. Paul Smith confirmed that under oath. (Hoppe Decl. at ¶ 8 and ¶ 9, Exhibit H and I.) In other words, Wolverine Proctor, by express, affirmative conduct, ratified and accepted the agreement executed by Monarch. All the smoke about how Monarch can't unilaterally modify the agreement merely by electing which pages to return for completion of the execution process cannot obscure this fact: CPM/WP accepted the agreement as presented by Monarch. *That* is what governs the dispute between the parties.

(*Id.* at 3.) Monarch's emphasis on California law and contract formation sets up its reputation of CPM's arguments about timeliness. According to Monarch, the final version of the contract did not

contain the section with the 12- and 18-month limitation provisions. Without a contractual limitation provision, Monarch relies on California's four-year limitation provision for litigation based on contractual obligations. (*Id.* at 5.)

Monarch next moves to substantive refutations. Monarch argues that its claim for breach of express warranties should go to trial because the final version of the contract contained no limitation on warranties and because the parties have a serious factual dispute about the dryer's ability to perform its essential function. (*Id.* at 6.) Monarch asserts that its claim for breach of implied warranties should go to trial because, again, the final version of the contract contained no limitations on that kind of warranty. Monarch rejects any application of the economic loss doctrine; Monarch believes that its fraud claims are distinct from its contractual claims and that no provision of the contract operates to eliminate the fraud claims. (*Id.* at 7.) With respect to claims for fraudulent or negligent misrepresentations, Monarch rejects the use of New York law and argues that California law would allow the claims to survive. (*Id.* at 7–8.)

From substantive arguments, Monarch moves to address damages. Monarch again rejects any suggestion that the final contract contained any provision limiting damages. (*Id.* at 9.) Monarch argues that California law allows for recovery of incidental and consequential damages. (*Id.*) The same California law allows for this recovery regardless of acceptance of goods. (*Id.* at 10.) California law, according to Monarch, also supports recovery of lost profits or expectation damages under the circumstances presented here. (*Id.* at 12.)

The Court adopts CPM's arguments as persuasive. As it discussed above, Revision 6—all 24 pages of it with the table of contents summarizing all 24 pages—is the complete and final contract between the parties. Regardless of any instance of faxing fewer than all 24 pages back and forth, the record contains no indication that the parties reached a meeting of the minds to cut off Revision 6

45

after the signature page. *Cf. Ellefson v. Megadeth, Inc.*, No. 04 CIV. 5395 (NRB), 2005 WL 82022, at *5 (S.D.N.Y. Jan. 13, 2005) ("By faxing a signed signature page to an undisputed, execution version of the Agreement, plaintiff signaled his willingness to be bound by its terms, rather than, as he now claims, a desire to continue negotiations . . . . The fact that the signature page did not contain the all of the terms is immaterial, as the terms of the contract are not disputed and were contained in the underlying Agreement.") (citations omitted). With respect to substantive arguments, Monarch never invoked paragraph 1(b) of Section G to cancel or to modify the order of drying equipment. (Dkt. No. 87-6 at 22.) Section G limited any warranties to express warranties against defects in materials and workmanship. (*Id.*) Monarch never claimed any such defects and is barred from claiming any other warranties. Monarch appears never to have invoked formally the protection of paragraph 2(e) in Section G, which would have obligated CPM to take back any non-conforming equipment with a full refund within 180 days of delivery. (*Id.* at 23.) Paragraph 2(e) was Monarch's exclusive remedy for non-conformity. *Cf. Genon Mid-Atl., LLC v. Stone & Webster, Inc.*, No. 11 CV 1299 HB, 2012 WL 1372150, at *6 (S.D.N.Y. Apr. 18, 2012) (summary judgment granted based on exclusive contractual remedies); *Wallingford Shopping, L.L.C. v. Lowe's Home Centers, Inc.*, No. 98 CIV. 8462 AGS, 2001 WL 96373, at *7 (S.D.N.Y. Feb. 5, 2001) (partial summary judgment granted on contractual claims based on provision for exclusive remedies). And CPM appears to have pinpointed blueberry size as the source of any problems with drying berries. (Dkt. No. 86-1 at 16–17, 19; Dkt. No. 86-16 at 19; Dkt. No. 94-4 at 4; Dkt. No. 98 at 3.) As for pre-contract representations, Monarch has not established that CPM made any representations in Revision 6 or elsewhere on the level of Christopher Kelley's Sell Sheet. Revision 6 simply describes equipment to be sold. *Cf. Eugene Iovine Inc. v. Rudox Engine & Equip. Co.*, 871 F. Supp. 141, 147 (E.D.N.Y. 1994) ("A claim based on fraud in the inducement will lie where the alleged fraudulent statements are representations of present fact, but not where they

are merely promissory statements as to what will be done in the future.") (citation omitted). Regardless of any representations that CPM might have made before the execution of Revision 6, Monarch agreed that "any affirmations of fact, description of the Equipment or sample or model, whether or not the same relate to production, capacity or capability of the Equipment to perform, are not the basis of this Agreement." (*Id.* at 24.) *Cf., e.g., Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 576 (2d Cir. 2005) ("When, however, the contracting party disclaims the existence of or reliance on specified representations, it will not be allowed to claim it entered the contract in reliance thereon.") (internal quotation marks and citation omitted); *Harsco Corp. v. Segui*, 91 F.3d 337, 345–46 (2d Cir. 1996) (affirming dismissal of fraud allegations based on merger clause). The limitations period in Section G and New York's economic loss rule, *see Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987), further strengthen CPM's arguments.

Simply put, Monarch had time under Revision 6 to claim defective materials and workmanship and to make CPM take the drying equipment back. Monarch never did so, and Revision 6 offers no other remedy, just as Monarch negotiated. Accordingly, the Court recommends granting CPM's motion in its entirety.

### G. Goodnature and Wettlaufer's motion for partial summary judgment (Dkt. No. 79).

Through this motion, Goodnature and Wettlaufer seek summary judgment on Monarch's first, second, fourth, sixth, seventh, and eighth claims. Goodnature and Wettlaufer also seek to enforce the contractual limitation on remedies. With respect to Monarch's first claim for professional negligence, Goodnature and Wettlaufer argue that the claim is duplicative of the breach of warranty claim and thus is barred by the economic loss rule. The second claim for fraud fails because of the economic loss rule and additionally for either of two reasons: If Monarch relies on oral representations predating the final contract then the final contract, with its express disclaimer of

47

warranties, controls; if Monarch instead relies on oral representations post-dating the final contract then the provision controls that declares the contract integrated and incapable of amendment except in writing. To this end, Goodnature and Wettlaufer draw the Court's attention to Interrogatory No. 5 from July 9, 2015, reprinted here in full:

> With respect to the allegations contained in Paragraph 9 and 10 of your Complaint, for each assurance/promise made by Wettlaufer and Goodnature describe: (a) the Goodnature representatives who made the assurance; (b) the Monarch/Munger representative to whom such assurance was made; (c) the date the assurance was made; (d) the substance of the assurance; and (e) any responsive or related statements made by Monarch/Munger's representatives.

(Dkt. No. 79-24 at 7.) Putting aside boilerplate objections, Monarch responded as follows:

> Defendants and Responding Party had multiple meetings prior to and during the installation of the infusion plant and dryer. Individuals who were present at some or all of these meetings included, but were not limited to, Dale Wettlaufer who was present from at least October 7 through October 10, 2013, Rick Hess, Rick Meredith, Andy Garcia, and Kable Munger. Raul Obrecht from Goodnature was at Munger Farms in early May 2012 for the running of the plant's first infuser. He returned the latter part of June 2012 to install an intralox belt on the trolly conveyor that feeds the infusers.

(*Id.*) Goodnature and Wettlaufer argue further that claims of fraud have to rest on statements of present fact and not promises about how equipment will perform in the future.

Continuing with the arguments in the motion, Goodnature and Wettlaufer seek summary judgment for Monarch's fourth claim for negligent misrepresentation because of the integration of the contract, the promises of future performance, and the economic loss rule. Goodnature and Wettlaufer seek summary judgment for the additional reason that they had no special relationship with Monarch. (Dkt. No. 79-34 at 22.) The contract's disclaimer of implied warranties forms the basis of the argument for summary judgment for the sixth claim for breaches of implied warranties. The economic loss rule forms the basis of the argument for dismissal of the seventh and eighth claims for strict liability and negligence. With respect to damages, Goodnature and Wettlaufer make

a number of arguments about how nearly all of Monarch's claimed damages are not available. (*See generally id.* at 24–30.)  In short, between the provisions of the contract and the UCC, Goodnature and Wettlaufer assert that, should Monarch be entitled to any remedy at all, the exclusive remedy would be repair or replacement of the infusion and drying equipment.

Monarch opposes the motion in all respects.  Monarch points to Quotation 1940, Revision 3—issued before the parties entered any contracts—and the specific representations that it made about reasonably expected yield, nutritional value, and juice production, among other details. (Dkt. No. 94 at 3.)  By arguing that these details gave it a frame of reference that made it more inclined to enter the contract in the first place, Monarch distinguishes two cases cited by Goodnature and Wettlaufer that contained express contractual language that the parties did not rely on specific representations: *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310 (2d Cir. 1993); and *Danann Realty Corp. v. Harris*, 157 N.E.2d 597 (N.Y. 1959).  Going beyond representations, Monarch seems to dispute exactly when any formal contract between the parties took effect and when the parties might have modified the contract:

> The agreement between the Plaintiffs and Goodnature was fluid and ongoing.  After the original "contract" in September and October of 2009, re-negotiation and modifications of the agreement began almost at once.  Goodnature re-negotiated their commission; changed their terms and charges for providing warm infusion technology and changed the terms of our initial agreement and advised us that we would not be able to produce and sell blueberry juice as a product of the Goodnature infusion process as previously warranted.

(Dkt. No. 94-4 at 3.)

Monarch makes other arguments as well.  Monarch accuses Goodnature and Wettlaufer of inconsistent arguments barred by judicial estoppel.  Monarch points specifically to the insistence on an integrated agreement that contained commitments to engineering services and the representations and Quotation 1940; while at the same time downplaying the representations and renegotiating

49

express terms of the original agreement. (Dkt. No. 94 at 4, 13.) Monarch also views the

renegotiations from a different perspective, as waivers of any integration clause in the original

agreement. (*Id.* at 8.) Monarch argues that a merger clause in the contract cannot defeat its claim

for fraud in the inducement, where it had to rely on Goodnature and Wettlaufer due to its lack of

sophistication with blueberry infusion and drying. (*Id.* at 5–6.) In a similar way, Monarch argues

that Goodnature and Wettlaufer had "peculiar knowledge" that it could not have verified and that

now defeats any argument based on disclaimer language. (*Id.* at 6.) With respect to the economic

loss doctrine, Monarch argues that its allegations of fraud are distinguishable from its allegations of

contractual breach:

> More specifically, these [fraud claims] concern implicit representations of
> *present* and *past* facts: that at the time the berry yield and juice production
> representations were made, there were no present facts supporting them—in fact,
> there were in existence at that time two sets of facts that "put the lie" to those
> representations: 1) test results on Monarch berries performed by Goodnature in its
> cold infusion process were far below what Goodnature represented to Monarch that
> it could expect with the process; 2) the Goodnature system installed at other food
> processors was not producing at a level consistent with Goodnature's
> representations.

(Dkt. No. 94 at 11; *see also id.* at 15.) Finally, Monarch rebuts all of Goodnature and Wettlaufer's

arguments concerning damages. According to Monarch, it never "accepted" any goods in the sense

that the entire infusion and drying project was a "work in progress." (*Id.* at 17.) Acceptance in any

event would not affect Monarch's right to be made whole. Monarch denies that repair and

replacement is its sole remedy because repair and replacement would refer only to the physical

equipment. Monarch also licensed a patented process, and if the patented process did not work

then, according to Monarch, other remedies would become available. (*Id.* at 18.) Monarch also

defends its right to pursue lost profit damages based on the fraudulent representations on which it

relied. (*Id.* at 20–21.)

After reviewing the papers and hearing from the parties, the Court concludes that the terms of the Licensing Agreement address most of the claims in question. The first claim concerning negligence in design and testing of the infuser system is superseded by the express warranty in the Licensing Agreement against defects in materials or workmanship. (Dkt. No. 94-3 at 83.) Under that express warranty, Monarch had one year from the date of delivery to invoke the warranty in writing. "The foregoing [express warranty against defects in material or workmanship] shall be the sole obligation of Seller under this warranty with respect to the equipment and other property included in this Agreement." (*Id.*) Monarch disclaimed all other warranties under the Licensing Agreement and agreed to repair or replacement as the exclusive remedy. (*Id.*) See N.Y. U.C.C. §§ 2-313, 2-316(2); *Xerox Corp. v. Graphic Mgmt. Servs. Inc.*, 959 F. Supp. 2d 311, 320 (W.D.N.Y. 2013); *Gunn v. Hytrol Conveyor Co.*, No. 10-CV-00043, 2013 WL 2249241, at *4–5 (E.D.N.Y. May 22, 2013) (citations omitted).

The second claim for fraud and deceit survives only in limited form. To the extent that Monarch has alleged any oral or written promises, including the Sell Sheet, that post-date October 24, 2009, those allegations are barred by multiple provisions of the Licensing Agreement. *See also Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992) ("[U]nder New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty.") (citation omitted). In the Licensing Agreement, Goodnature and Wettlaufer explicitly made no guarantees about yield. (Dkt. No. 94-3 at 67.) The Licensing Agreement "supersedes all prior agreements, understandings, representations, and statements, if any, regarding the subject matter contained herein, whether oral or written." (Dkt. No. 94-3 at 68.) The Licensing Agreement had a separate merger clause at the end that established it as "the entire Agreement" and that held any other representations or promises to "be of no force or effect." (Dkt. No. 94-3 at 84.) And the

above factors do not include the statement in the Sell Sheet that "[n]utritional values will be verified with your ongoing product testing" (Dkt. No. 76-3 at 56), putting at least some responsibility on Monarch. That said, even the Licensing Agreement gave Monarch some impression about what performance Monarch reasonably could expect from the infusing equipment, with an implication that these expectations rested on the present state of the technology. (*See* Dkt. No. 94-3 at 67, 80.) *Cf. Coolite Corp. v. Am. Cyanamid Co.*, 384 N.Y.S.2d 808, 810 (N.Y. App. Div. 1976). The way in which the Sell Sheet was written suggests that it was a reduction of pre-contract oral representations, not a new document that would have been generated unnecessarily after the sale concluded. Kelley's unavailability complicates the effort to untangle how hard he tried to get Monarch into a final contract. When Monarch owner Kable Munger stated that he relied on Kelley's representations, he might have been referring to oral representations later reduced to the Sell Sheet. (Dkt. No. 76-3 at 68.) While sample testing produced at least some results within the desired range, at least some pre-contract testing did not. (Dkt. No. 75-3 at 91.) The undesired test results might have been obscured by other representations meant to increase the likelihood that Monarch would sign the Licensing Agreement. *Cf. Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("New York also permits the use of parol evidence to prove a claim of fraud in the inducement, even where the written contract contains an integration, or merger, clause.") (citations omitted); *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998) ("[I]f the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge, even a specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations.") (citations omitted); *Hobart v. Schuler*, 434 N.E.2d 715, 716 (1982) ("[S]uch a general merger clause is generally insufficient to bar parol evidence of a fraudulent misrepresentation. Further, the fraudulent representation which forms the basis of defendant's

affirmative defense is not specifically contradicted by any of the detailed representations or warranties contained in the agreement.") (citations omitted). The second claim thus should survive to the extent that it alleges fraudulent inducement to sign the Licensing Agreement.

Monarch runs into trouble with its other claims. The fourth claim is essentially identical to the now-truncated second claim and should be either dismissed as duplicative or merged into the second claim. The sixth claim fails as contrary to the explicit disclaimer of implied warranties set forth in the Licensing Agreement. (Dkt. No. 94-3 at 83.) The seventh and eighth claims make allegations that should have been addressed by the repair and replacement provisions of the Licensing Agreement. As these claims thus are contractual in nature, they are barred by the economic loss rule.

For the above reasons, the Court recommends granting Goodnature and Wettlaufer's motion except to leave the second claim in place as a claim for fraudulent inducement to enter the Licensing Agreement.

### H. Goodnature and Wettlaufer's motion for default judgment or, alternatively, for summary judgment on their counterclaims (Dkt. No. 81).

The core of this motion is fairly simple. On August 1, 2016, Monarch filed its amended complaint. On August 30, 2016, Goodnature and Wettlaufer filed an answer to the amended complaint that contained counterclaims. Monarch did not answer the counterclaims until April 2, 2018. Officially, according to Goodnature and Wettlaufer, Monarch now is in default on their counterclaims. According to the counterclaims, Monarch owes $300,000 under the Licensing Agreement for the years in which it had an exclusive license. (Dkt. No. 81-15 at 3.) Monarch also owes $258,981.70 in restocking charges; $46,575.66 for shipping charges; and $195,000 for the rental of a 1,000-pound pilot laboratory infuser. (*Id.* at 5–7.)

Monarch opposes the motion in all respects. Monarch makes the procedural argument that Goodnature and Wettlaufer skipped directly to seeking default judgment under Rule 55(b) without first seeking an entry of default under Rule 55(a). (Dkt. No. 95 at 3.) Monarch also points out that it did in fact answer the counterclaims, on April 2, 2018. (Dkt. No. 82.) Monarch admits that the answer came very late but argues that the delay was not willful and that any delay did not cause any prejudice. Additionally, Monarch argues against summary judgment for the counterclaims. In arguments that resemble the arguments for its own motions, Monarch asserts that the infusion process never functioned properly; that the infusion process took too long; that testing of both the process design and output was inadequate; that insufficient training occurred; and that the infusion process posed sanitation problems. Monarch additionally argues that any allegedly un-purchased items listed in the counterclaims were not subject to cancellation fees under the contract. (Dkt. No. 95 at 11.) Finally, Monarch raises questions of fact about unpaid rent for the laboratory infuser in question; Monarch suggests that it bought the laboratory infuser outright. (*Id.* at 12.)

Monarch has the better argument with respect to default judgment. The Second Circuit has not used the words "required" or "prerequisite" when discussing an entry of default, but "[t]he procedural steps contemplated by the Federal Rules of Civil Procedure following a defendant's failure to plead or defend as required by the Rules begin with the entry of a default by the clerk upon a plaintiff's request." *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981) (citation omitted); *see also, e.g., Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 783 (8th Cir. 1998)("When a party 'has failed to plead or otherwise defend' against a pleading listed in Rule 7(a), entry of default under Rule 55(a) must precede grant of a default judgment under Rule 55(b).") (citation omitted); *Grant v. City of New York*, 145 F.R.D. 325, 327 (S.D.N.Y. 1992) (finding that "entry of default is an essential prerequisite for a default judgment") (citations omitted). Goodnature and Wettlaufer never sought an entry of default,

and the docket indicates that Monarch was actively participating in discovery and actively preparing its case for dispositive motions or trial. Goodnature and Wettlaufer thus cannot avail themselves of an alternative principle that courts can enter defaults against parties that are inactive even if they file an answer. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 130 (2d Cir. 2011) (citations omitted). In this context, the Court will not recommend an entry of default.

Neither will the Court recommend summary judgment on any of Goodnature and Wettlaufer's counterclaims, but not quite for the reasons that Monarch has expressed. Among its surviving claims, Monarch has a claim for fraudulent inducement to enter the Licensing Agreement. The Court discussed above how that claim should survive to trial. If Monarch should succeed in establishing fraudulent inducement at trial then available remedies would include the equitable remedy of recission, which could have a significant effect on Goodnature and Wettlaufer's counterclaims. *See, e.g., Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 874 (N.Y. 1972) (discussing recission); *Sabo v. Delman*, 143 N.E.2d 906, 907 (N.Y. 1957) (discussing recission). Prudence warrants waiting to see what happens with the fraudulent inducement claim before determining whether Goodnature and Wettlaufer should receive relief under their counterclaims.

Accordingly, the Court recommends denying the motion.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends adjudicating the pending motions as follows:

1)    Denying Monarch's motion for partial summary judgment on some of Goodnature and Wettlaufer's counterclaims (Dkt. No. 75);

2)    Denying Monarch's motion for partial summary judgment on the second claim of the amended complaint (Dkt. No. 76);

3)    Granting CPM's motion for summary judgment (Dkt. No. 78);

4)    Granting Goodnature and Wettlaufer's motion for partial summary judgment (Dkt. No. 79), except that the second claim of the amended complaint should survive to the extent that it alleges fraudulent inducement to sign the Licensing Agreement; and

5)    Denying Goodnature and Wettlaufer's motion for default judgment or for summary judgment on the counterclaims (Dkt.  No. 81).

For the sake of clarity, upon adoption of this Report and Recommendation, the following claims or counterclaims will be ready for trial:

1)    Monarch's second claim against Goodnature and Wettlaufer for fraudulent inducement to enter the Licensing Agreement;

2)    Monarch's fifth claim against Goodnature and Wettlaufer for breach of contract/breach of express warranties; and

3)    All of Goodnature and Wettlaufer's counterclaims against Monarch.

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted).  "Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round.  In addition, it would be fundamentally

unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and—having received an unfavorable recommendation—shift gears before the district judge." *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988) (citations omitted).

SO ORDERED.

_/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: September 19, 2018